**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MICHAEL DEWAYNE COMPTON,                    Case No. 1:11-cv-626

        Plaintiff,                                  Spiegel, J.
                                                     Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Michael Dewayne Compton filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be REVERSED, because it is not supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

In November 2008, Plaintiff filed applications both for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning January 1, 2005 due to bipolar disorder and post traumatic stress disorder ("PTSD"). (Tr. 15, 189, 197, 246). After Plaintiff's claims were denied initially and upon reconsideration, he requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). In August 2010, an evidentiary hearing was held before ALJ Christopher McNeil, at which Plaintiff was

represented by counsel. (Tr. 34-104). At the hearing, the ALJ heard testimony from Plaintiff, from Plaintiff's friend (Thomas Hale),[1] from Plaintiff's caseworker (Erin Cadle), from medical expert Terry R. Schwartz, Psy. D., and from a vocational expert. On November 2, 2010, the ALJ denied Plaintiff's applications in a written decision. (Tr. 15-28).

The record on which the ALJ's decision was based reflects that Plaintiff was 44 years old at the time of the evidentiary hearing. Although Plaintiff completed school only through the ninth or tenth grade, he later obtained his GED. (Tr. 22, 161, 251). Plaintiff had past relevant work as a warehouse laborer, warehouse or distribution manager, order picker, and metal pourer. (Tr. 25, 161). However, Plaintiff has not worked since his alleged onset date. (Tr. 17). Plaintiff lives in a structured environment (Tender Mercies), in housing designed for residents with a history of mental illness, although he sometimes resides for brief periods with his friend, Mr. Hale. At Tender Mercies, he is given assistance with medication and provided meals. (Tr. 259). However, he is able to clean his own room, does his own laundry, and attends daily AA meetings. (Tr. 260). He also works approximately 2 hours at a time, 2-4 times per week, at a shop at Tender Mercies. (Tr. 264).

Based upon the record and testimony presented, the ALJ found that Plaintiff had the following severe impairments: "mood disorder; post-traumatic stress disorder; alcohol dependence; and opioid dependence." (Tr. 18). The ALJ concluded that none of Plaintiff's impairments alone or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subp. P, Appendix 1. (Tr. 19). Instead, the ALJ determined that Plaintiff

---

[1] Records describe Mr. Hale as Plaintiff's "significant other." (Tr. 278).

retains the residual functional capacity ("RFC") to perform his past relevant work as a metal pourer and order picker.  (Tr. 25).  In addition and in the alternative, the ALJ determined that Plaintiff is capable of performing a full range of work at any exertional level, restricted only by the following non-exertional limitations:

> [T]he claimant is able to adapt to a simple, low stress, repetitive occupation with regular supervision and few production pressures.  Moreover, the claimant should work in environment that requires no contact with the general public, and only occasional contact with co-workers and/or supervisors.

(Tr. 19).  Based upon the testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that aside from his prior work, "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform." (Tr. 26).  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Social Security Regulations, and was not entitled to DIB or to SSI.  (Tr. 27).

The Appeals Council denied Plaintiff's request for review.  Therefore, the ALJ's decision stands as the Defendant's final determination.  On appeal to this Court, Plaintiff first argues that the ALJ erred by rejecting the opinion of Plaintiff's treating physician.  Plaintiff further contends that the ALJ erred by failing to include in certain limitations in the hypothetical question posed to the Vocational Expert.  As discussed below, the Court agrees that the ALJ's errors require reversal and remand.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning,

a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are

"severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

### B. Improper Assessment of Medical Evidence

Applicable regulations generally require the Commissioner to assign "controlling" weight to the opinions of treating physicians, and to assign greater weight to the opinions of examining physicians than to the opinions of non-examining consultants. The administrative record in this case includes a mental assessment by Plaintiff's treating psychiatrist, which, if accepted, would render Plaintiff to be disabled. The record also contains an assessment by an examining consultant on behalf of the Social Security Administration, which assessment also would render Plaintiff to be disabled. A third opinion was offered by a non-examining medical expert, who testified at the administrative hearing. That expert also opined that Plaintiff was disabled, on the basis that Plaintiff equaled two separate Listings for mental disability. However, the ALJ rejected all three of these medical opinions, determining instead that Plaintiff was not disabled, based upon a fourth opinion by a non-examining consultant who did not have access to Plaintiff's complete medical records.

Plaintiff's two claims of error both concern the ALJ's rejection of medical opinion

evidence that favored additional limitations and a disability finding.  On the record presented, the Court agrees that the ALJ committed reversible error, requiring remand for further review.

### 1. Treating Physician Opinion

Plaintiff's first claim of error concerns the ALJ's rejection of the opinion of his treating psychiatrist, Dr. Indre Rukseniene, who completed a mental assessment of Plaintiff's functioning in July 2010.  (Tr. 663-665).  Plaintiff argues that if Dr. Rukseniene's opinion had been given the appropriate weight, Plaintiff would have met Listing 12.03(C), based upon his documented history of chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration.  The ALJ gave the July 12, 2010 opinion of Dr. Rukseniene "little weight."  (Tr. 25).  The ALJ explained:

> The assessment is severely more restrictive than the finding reached in this decision, and Dr. Rukseniene seemed to accept as true most, if not all, of the claimant's subjective report of symptoms and limitations.  Yet, as explained elsewhere in the decision, good reasons exist for questioning the reliability of the claimant's subjective complaints.  The assessment is also inconsistent with the other objective medical evidence of record, which renders it significantly less persuasive.  For example, Dr. Rukseniene reported that the claimant's paranoia significantly limits his social functioning; however, only a few days earlier, treatment notes talk about the claimant being accompanied by several friends.  See Exhibit 19F.  Moreover, she indicated numerous symptoms of depression and anxiety would affect the claimant's ability to maintain concentration and attention in the workplace, but the aforementioned treatment notes revealed clinical findings well within normal limits and a stable condition.  *Id.*
>
> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest

of the evidence of record, as in the current case.

(Tr. 25).  Plaintiff argues that this explanation does not constitute "good reasons" for rejecting his treating physician's opinion.

The relevant regulation concerning the opinions of treating physicians, 20 C.F.R. §404.1527(c)(2), provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  *Id.*; *see also Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> . . . these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires "the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."  *See Blakely v. Commissioner of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

Despite the presumptive weight given to the opinions of the treating physician, if those opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight.  Soc. Sec. Ruling 96-2p, 1996 WL

374188, at *2 (July 2, 1996).  In such cases, the ALJ should review additional factors to determine how much weight should be afforded to the opinion, such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009); *see also* 20 C.F.R. §404.1527(c)(2).  "[A] finding that a treating source medical opinion...is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*, 581 F.3d at 408 (quoting Soc. Sec. Rul. 96-2p).

When the treating physician's opinion is not given controlling weight, the ALJ must provide "good reasons" for doing so.  *Id.*; 20 C.F.R. §404.1527(c)(2). Good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 406-407; *see also* Soc. Sec. Rul. 96-2p.  An ALJ's failure to provide an adequate explanation for according less than controlling weight to a treating source may only be excused if the error is harmless or *de minimis*, such as where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d at 409 (*quoting Wilson*, 378 F.3d at 547).

The ALJ's rejection of the treating psychiatrist's opinion in this case reflects clear error.  The ALJ first rejected the opinion because it was based upon Dr. Rukseniene's acceptance of Plaintiff's "subjective report of symptoms and limitations."  However, the

nature of psychiatry, by definition, requires some assessment of subjective reports.  As the Sixth Circuit has noted, rejecting psychiatric evidence simply because it is based on "subjective complaints" can be problematic, since psychiatric reports "do not easily lend themselves to the same degree of substantiation as other medical impairments." *Walker v. Sec. Of Health and Human Servs*., 980 F.2d 1066, 1071 n.3 (6th Cir. 1992).  Thus, courts have found that a psychological opinion that is established "through clinical observations" or "proper psychological techniques" can suffice to demonstrate a "medically determinable" disability.  *Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990).

In the case presented, Plaintiff has received treatment at Centerpoint Health, a community mental health center, at least since 2006.[2]  Plaintiff's then-current case-worker testified at the August 2010 hearing that she had reviewed Plaintiff's records for the prior 18 months.  (Tr. 42).  The case-worker, Ms. Erin Cadle, testified that Dr. Rukseniene is "the psychiatrist at our office that works with all of our clients."  (Tr. 45).  Clinical notes from Dr. Rukseniene are not overwhelming in number, to the extent that most of Plaintiff's records from Centerpoint and/or Talbert House reflect illegible signatures.  However, the few records that can clearly be attributed to Dr. Rukseniene reflect that she saw Plaintiff as often as monthly for management of Plaintiff's medications.  By contrast, Plaintiff's case-worker testified that she saw Plaintiff weekly, and spoke with him by telephone several times per week.  Presumably Dr. Rukseniene did not perform extensive diagnostic testing because Plaintiff's diagnosis was well-established.  While Dr. Rukseniene's clinical notes were relatively sparse, her expertise as his psychiatrist, and the overwhelming consistency

---

[2]Defendant notes that when seen at Central Community Health in 2004, he did not "follow through, take meds, or seek treatment, period."  (Tr. 321, 326).  However, Plaintiff's claimed disability onset date is 2005.

of her opinions with the other psychiatric and psychological evidence in the record (discussed below) lead this Court to conclude that the ALJ erred in rejecting her opinions as based too heavily on Plaintiff's "subjective" reports.  (*See generally* treatment notes at Tr. 502, 503, 529, 535, 559, 606, 608, 646, 651).

As stated, the second basis the ALJ gave for rejecting Dr. Rukseniene's opinions was that the opinions were alleged to be "inconsistent with the other objective medical evidence of record." (Tr. 25).  By way of example, the ALJ cited to Dr. Rukseniene's report that Plaintiff's paranoia "significantly limits his social functioning," which paraphrased Dr. Rukseniene's opinion that Plaintiff's paranoia "limits abilities to be around others" in a work setting.  (*Id.*, citing Tr. 663).  Dr. Rukseniene specifically opined that Plaintiff was "markedly" limited in his ability to interact with supervisors and relate to co-workers, to persist at a work-like tasks, or to maintain attention and concentration. (Tr. 663).  She also determined that he was "extremely" limited in his ability to deal with work stresses.  (Tr. 663).

Mischaracterizing Dr. Rukseniene's opinion as concerning "social functioning," the ALJ found the opinion to be "inconsistent" with treatment records, dated July 2-3, 2010, that reflected that the Plaintiff had been accompanied to an emergency room (where he was admitted involuntarily to a psychiatric unit, to prevent his suicide)[3] by "several friends." However, Plaintiff himself reported that his only social contacts were with AA friends.  (Tr. 471).  The fact that a mentally ill claimant has friends from a AA support group, who would care enough to accompany him to the hospital in an attempt to prevent his suicide, is not

---

[3] The records reflect that Plaintiff had previously been admitted to the same psychiatric unit for similar issues of depression and suicidal ideation, from January 11-13, 2010.  (Tr. 582-597).  Plaintiff reported a one-day relapse in heroin use at that time.

inconsistent with Dr. Rukseniene's findings of marked interpersonal impairment in a work environment.

The second "inconsistency" that ALJ points out also rings hollow.  Dr. Rukseniene determined that Plaintiff's depression and anxiety would affect his ability to maintain concentration and attention in the workplace, but the ALJ pointed to the same set of treatment notes, from Plaintiff's July psychiatric admission, as reflecting "clinical findings well within normal limits and a stable condition."  Contrary to the ALJ's finding, this single set of treatment notes does not portray a person who operates "well within normal limits." Plaintiff was referred to the emergency room by a treating psychiatrist, Dr. Harris,[4] and was admitted after evaluation.  Hospital admission notes reflect that Plaintiff presented as depressed and anxious, with "racing, paranoid, and preoccupied" thoughts and "visual hallucinations of finding his dead brother who was murder [sic] by his uncle...at a farm where pigs [were] eating the patient's brother['s] insides." (Tr. 658).  Although Plaintiff was discharged the next day on grounds that he no longer met criteria for continued involuntary admission, discharge notes do not reflect someone "within normal limits."  Instead, the notes reflect that the patient was "much better" after dosing with additional psychiatric medication (Ativan) to calm him, and he was sufficiently "stable" to continue treatment on an out-patient basis, rather than requiring continued inpatient treatment.  (Tr. 655).  His GAF score at discharge was assessed at 50, reflecting "serious symptoms." (*Id.*).[5]  In fact,

---

[4] Although it is unclear whether Dr. Harris signed any of the clinical notes in the record, there is evidence that Plaintiff began treating with Dr. Harris in January of 2009.  (Tr. 553).

[5] The GAF Scale reports an individual's overall level of functioning. A GAF score of 41-50 indicates that a person has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social or occupational functioning (e.g., no friends and unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, 34 (2000).  Despite wide-spread use and testimony about Plaintiff's GAF score in the record at issue, "the Commissioner 'has declined to

virtually all of Plaintiff's clinical records throughout the administrative record consistently portray an individual with long-standing limitations resulting from his mental illness, consistent with his treating psychiatrist's assessment.

The ALJ's third basis for rejecting Dr. Rukseniene's opinions reflects pure speculation, suggesting - without any support whatsoever - that Dr. Rukseniene might have been attempting "to assist a patient with whom ... she sympathizes for one reason or another" or that her opinions might have been influenced by Plaintiff's demands for supportive notes, and Dr. Rukseniene's desire "to satisfy" Plaintiff's (presumed) requests and "avoid unnecessary doctor/patient tension." (Tr. 25). The ALJ suggested that these motives are more likely to be present in this case, based upon the alleged departure of Dr. Rukseniene's opinions from the rest of the record. However, in reviewing the administrative record presented, it becomes clear that it is the ALJ's opinions and not those of Dr. Rukseniene that depart substantially from the rest of the record.

### 2. Examining Consultant, Dr. Michael Nelson

The administrative record includes several opinions from consultants, both examining and non-examining. In December 2008, W. Michael Nelson, Ph.D, examined Plaintiff on behalf of the Social Security Administration. (Tr. 445). Plaintiff reported a traumatic childhood to Dr. Nelson, with two siblings having committed suicide, abusive parents, and a history of sexual abuse by both a neighbor and an older brother. (Tr. 449). At the age of 11, Plaintiff discovered the body of his older brother, who had been murdered by Plaintiff's uncle. (*Id*). When Plaintiff found his brother's body, it had been partially eaten

---

endorse the [GAF] score for "use in the Social Security and SSI disability programs," and has indicated that [GAF] scores have no "direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411 (6th Cir.2006)(additional quotations omitted).

by pigs.  (*Id*.).  In his interview with Dr. Nelson, Plaintiff also reported a history of alcohol and drug abuse.  (*Id*.).

Dr. Nelson diagnosed Plaintiff with a mood disorder, NOS, with PTSD, and with alcohol and opioid dependence (reportedly in remission since June 6, 2008).  (*Id*).  Dr. Nelson concluded that Plaintiff had "marked" impairments in his abilities to relate to others or to withstand workplace stress and pressure, as well as "moderate" impairments in attention and concentration.  (Tr. 450).   Dr. Nelson additionally assigned Plaintiff a GAF score of 45, reflecting "serious difficulties if he were working."  (Tr. 449-450).

The ALJ acknowledged Dr. Nelson's report, but focused heavily on the more benign notations by Dr. Nelson that Plaintiff had "adequate eye contact, demeanor, speech, and an ability to 'make important decisions affecting his future...'" (Tr. 22, citing Exhibit 6F, pp. 4-5).  The ALJ also used partial quotations, noting that "Dr. Nelson found no evidence of pervasive fragmentation of perception, thought, or emotion, and believed that claimant could function in the average range." (*Id.*).  The full quotation from the report reflects Dr. Nelson's diagnostic opinion that Plaintiff did not suffer from schizophrenia because "there are no indications in the clinical interview of any pervasive fragmentation of perception, thought, or emotion as in the schizophrenias."  (Tr. 448).  Similarly, the context of Dr. Nelson's reference to Plaintiff functioning in the "average" range pertained to the assessment of his intelligence.  "Intellectually, it is estimated that Mr. Compton has the ability to function in the average range, as reflected in his use of vocabulary and manner of expressing himself."  (Tr. 448).

The ALJ rejected all "marked" limitations found by Dr. Nelson, relying in part upon Dr. Nelson's acknowledgment that Plaintiff's medication regimen "had been successful in

decreasing his symptoms." (Tr. 22). However, Dr. Nelson noted "marked" limitations despite the moderation of his anxiety symptoms on medication, explaining that "[n]evertheless," Plaintiff still suffers from severe anxiety attacks on a weekly basis, and that Plaintiff's "legs and hands shook very noticeably throughout the clinical interview." (Tr. 447).

In giving Dr. Nelson's positive findings "some weight" while simultaneously rejecting Dr. Nelson's negative findings, the ALJ found that Plaintiff "has demonstrated a level of functioning significantly beyond that reported to Dr. Nelson during his evaluation." (Tr. 24). The ALJ also was dismissive of Dr. Nelson's conclusions because "Dr. Nelson seemed to accept as true the claimant's subjective report of symptoms and limitations." (*Id.*). As discussed above with respect to the ALJ's rejection of Dr. Rukseniene's opinions, rejecting a psychological opinion merely because it is based upon a patient's own "subjective report" is not a sufficient reason to reject an opinion that is established "through clinical observations" or "proper psychological techniques." *See Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990).[6] Here, the ALJ's use of partial quotations and findings from Dr. Nelson's report also suggests an interpretation that is not fully supported by this Court's review of that report.

### 3. Medical Expert/Advisor, Dr. Terry Schwartz

In cases where the medical records are extensive and/or particularly complex, an ALJ may seek testimony from an independent medical advisor or medical expert (ME) as the ALJ did in this case, in order to "make sense of the record." *Buxton v. Halter*, 246 F.3d

---

[6] Ironically, the ALJ appeared to accept wholesale the report of a non-examining psychologist, whose report was not based upon clinical observations, but instead was based upon a review of incomplete records and at times appears to have mischaracterized Plaintiff's "subjective reports."

762, 775 (6th Cir. 2001).  Here, Terry R. Schwartz, Psy.D., provided testimony regarding Plaintiff's mental limitations.  Like the opinions of other medical sources, a medical expert's opinion may constitute substantial evidence when supported by other medical evidence of record.  *See Atterberry v. Sec'y of Health and Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989).  Although the opinion of a treating physician ordinarily is entitled to greater weight than the opinion of a non-examining medical advisor, *see Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983), an ALJ's acceptance of an ME's opinion over the opinion of an examining or treating physician can be appropriate, especially when the medical expert has access to a claimant's entire medical record.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

On the facts presented, the opinions of Dr. Schwartz were actually consistent with, rather than inconsistent with, the opinions of Plaintiff's treating physician and the examining consultant.  Dr. Schwartz testified that Plaintiff's condition would equal both Listing 12.04 (affective disorder) and Listing 12.06 (anxiety related disorder), resulting in a presumption that he is disabled.  (Tr. 46).   Although the ALJ interpreted Dr. Schwartz's testimony as stating that "when claimant's substance use was removed, his affective disorder would no longer meet or equal a Listing," (Tr. 25), I do not find support for that conclusion in the transcript:

> A: [Dr. Schwartz] ........I do think he can be described with 12.04, the affective disorder, 12.06, the anxiety-related disorder, and 12.09, the substance addition disorder.
>
> Q: All right. ...Are you saying that the claimant, the impairments meet or medically equal any of those listings?
>
> A: Your honor, I believe that historically, because of his substance abuse and dependency, that drugs and alcohol unequivocally had a severe impact upon

him. And I'm also saying that, as of January [2010], *past his relapse*...there are indications that his psychiatric problems, which would include the affective and the anxiety, continue and would most likely, since they have global assessment of functioning of 50 and 45 and so forth, there are, there's one or two indications here of 55, which is not as bad, but, anyway, most likely would.

Q: Would what?

A: Would meet or equal the 12.04 and 12.06.

(Tr. 45-46, emphasis added).

Dr. Schwartz testified that Plaintiff had moderate limitations in activities of daily living, marked limitations in social functioning, and marked limitations in maintaining concentration, persistence, and pace. (Tr. 48). Dr. Schwartz also testified that Plaintiff's condition deteriorated after Plaintiff stopped using substances, based upon his most recent treatment records, (Tr. 56). In that respect, Dr. Schwartz expressed some doubt about the opinions of another non-examining consultant (upon whose opinions the ALJ ultimately relied), because that consultant did not have access to or review Plaintiff's most recent records. However, upon prompting from the ALJ, Dr. Schwartz further testified that he found "not a thing" in the records to support Dr. Rukseniene's description of the extreme limitations she included on Plaintiff's mental RFC form. (Tr. 57).

Plaintiff argues persuasively that his symptoms were more severe than as described by Dr. Schwartz. For example, although Dr. Schwartz minimized Plaintiff playing "movies" in his head as not "particularly disturbing," (Tr. 60), the records and Plaintiff's own testimony reflect that the so-called "movies" were of Plaintiff's brother's death or his daughter being raped. (Tr. 60-61, 74, 76). Plaintiff additionally complains that the medical advisor failed to acknowledge notations in Plaintiff's records to "AV," or audio-visual

hallucinations.  (Tr. 67).  In fact, review of the transcript of Dr. Schwartz's testimony reflects that he frequently professed an inability to read Plaintiff's clinical records, particularly those with details that supported Plaintiff's PTSD diagnosis, (*see* Tr. 61, 63, 65-67), and/or an inability to interpret the same records.  Nevertheless, Dr. Schwartz's opinion was rejected by the ALJ to the extent that his overall testimony supported a finding that Plaintiff met or equaled one or more of the listed impairments for a mental disability.

### 4.  Non-examining, Non-testifying Consultant

Rather than fully accepting any of the referenced three medical opinions, the ALJ relied exclusively on a mental RFC form completed by a non-testifying, non-examining consultant, Patricia Semmelman, Ph.D.    Dr. Semmelman completed her report a few weeks after Dr. Nelson's examination of Plaintiff, on January 13, 2009, but rejected Dr. Nelson's examination findings and conclusions.  (Tr. 452-468).  Dr. Semmelman did not have access to or review Plaintiff's treatment records after 2008; in short, she did not review most of the treatment records that were before the ALJ.  As discussed above, those records reflect additional severe limitations, consistent with Plaintiff's statements to the consultative examiner, and consistent with the testimony of Plaintiff's case manager and the opinions of his treating psychiatrist.

By contrast, Dr. Semmelman completed a mental RFC assessment that indicated only "moderate" limitations in Plaintiff's social functioning and in his concentration, persistence and pace, with "mild" limitations in daily living.  (Tr. 462).  As counsel noted at the hearing, Dr. Semmelman's notes inaccurately reflect that Plaintiff was in treatment for only a couple of months.  (*See* Tr. 49-50, 468).  The other reasons provided by Dr. Semmelman for rejecting the opinions of Dr. Nelson were that: (1) Plaintiff "enjoys cooking

and reports he engages in some hhc [household chores]," (2) Plaintiff inconsistently reported the details of his brother's murder, and which years of childhood he was sexually abused; (3) Plaintiff's records reflect inconsistent reports of PTSD symptoms and anxiety; (4) Plaintiff's records do not contain drug testing to substantiate that he has been clean and sober; (5) records contain inconsistent reports of the degree to which Plaintiff socializes; and (6) records contain inconsistent reports of hallucinations. (Tr. 468). Dr. Semmelman's opinions do not appear to be supported by the administrative record reviewed by this Court. Given that Dr. Semmelman did not have access to or review the majority of Plaintiff's most critical treatment records, it was error for the ALJ to solely rely on her opinion to the exclusion of all others. *See Blakley*, 581 F.3d at 409 (remanding where the non-reviewing consultant had failed to review the most recent medical records, and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions, quoting *Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007)).

### C. Improper Finding of Prior Relevant Work

In addition to the referenced errors in interpreting the medical evidence, Plaintiff complains that the VE did not consider the sustained degree of concentration, persistence and pace required by Plaintiff's prior jobs of metal pourer and order picker.

Plaintiff points out that the ALJ determined that the job of metal pourer was never performed at the substantial gainful activity level (Tr. 18), so that position should not have been considered to be past relevant work. Defendant does not disagree, but argues that any error was harmless, given testimony that Plaintiff could still work as an order picker or packer.

18

However, both the job of packer and the job of order picker are listed at the DOT R2 level of reasoning, defined as requiring the ability to "[a]pply commonsense understanding to carry out *detailed* but uninvolved written or oral instructions," and to [d]eal with problems involving a few concrete variables in or from standardized situations." *See* Http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (Description of R2 level of reasoning, emphasis added)*; see also generally* DOT 922.687.058 (description of warehouse worker or order picker; DOT 920.587.018 and DOT 559,687.074 (description of packer); *Edwards v. Barnhart*, 383 F. Supp.2d 920, 931 (E.D. Mich. 2005)(noting that job of packer "seems to require a degree of sustained degree of concentration, persistence and pace.").

Defendant alternatively argues that the ALJ's conclusion can nevertheless be upheld because Dr. Semmelman opined that Plaintiff could "sustain concentration and attention for routine tasks," (Tr. 468), and even Dr. Rukseniene opined that Plaintiff "would be able to complete the first one or two steps of directions." (Tr. 664). However, Dr. Semmelman also characterized Plaintiff as "moderately" limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination or proximity to others without being distracted. (Tr. 366). In addition, aside from the fact that Dr. Semmelman's opinions fall short of substantial evidence, the ALJ failed to include *any* restrictions on Plaintiff's ability to sustain concentration, persistence and pace in the hypothetical presented to the vocational expert. The ALJ's shortened reference to "simple, low-stress, repetitive" jobs with "few production pressures," is insufficient. (Tr. 102). *See generally Ealy v. Comm'r*, 584 F.3d 504, 516 (6th Cir. 2010)(where medical source opinions specifically limited Plaintiff's ability to sustain

attention and imposed restrictions in pace, speed and concentration, ALJ's "streamlined" hypothetical omitting those restrictions was insufficient); *accord Ramirez v. Barnhart*, 372 F.3d 546, 552-553 (2d Cir. 2004)(hypothetical limiting claimant to simple, repetitive, one to two step tasks not sufficient to encompass deficiencies in concentration, persistence and pace); *Edwards v. Barnhart*, 383 F. Supp.2d at 930-931 (hypothetical limiting claimant to "jobs entailing no more than simple, routine, unskilled work" not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace). Therefore, this error also requires remand.

### D. Remand Required to Reconsider Listing Criteria

The ALJ concluded that Plaintiff did not meet or equal Listing 12.04. Although Plaintiff had argued (and the testimony at the hearing supported) that he also met Listing 12.06, the ALJ did not discuss that Listing at all. Plaintiff further argues on appeal that he met or equaled Listing 12.03(C) - a Listing also not referenced by the ALJ.

When a claimant claims disability from a mental impairment, an ALJ must rate the degree of functional limitation resulting from that impairment with respect to "four broad functional areas," including: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§404.1520a(b)(2), (c)(3). These four areas are commonly referred to as the "B criteria." *See Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009)(citing 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00 et seq.). Evaluating the B criteria, the ALJ determined that Plaintiff suffered from only "mild" limitations in activities of daily living, with "moderate" limitations in social functioning, and in maintaining concentration, persistence or pace, and "one episode of decompensation" after the claimed disability onset date. (Tr. 19). As

discussed, the ALJ's findings on the B criteria cannot be upheld, because they are not supported by substantial evidence in the record as a whole.

The ALJ's findings with respect to the "C criteria" are equally deficient.  Even if a claimant does not satisfy the B criteria, he can still meet or equal a mental impairment Listing if he alternatively satisfies the "C criteria" of that Listing.  Here, the ALJ's opinion simply states, in conclusory fashion and without any discussion,[7] that "the evidence fails to establish the presence of the "paragraph C" criteria."  (Tr. 19).

To meet Listing 12.04 under the C criteria, the individual must demonstrate a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support."  The record reflects that Plaintiff has a documented history of a mood disorder of more than 2 years' duration that meets the first criterion of Listing 12.04(C), in terms of the disorder's "more than minimal" effect on Plaintiff's ability to perform basic work activities, even on medication with psychosocial support.  However, to meet the Listing, the claimant must additionally show that he meets one of the three following prongs: "1. Repeated episodes of decompensation, each of extended duration; or 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  *Id.*

---

[7] Dr. Semmelman expressed her opinion only on the B criteria, and did not provide any opinion on Plaintiff's ability to meet the C criteria.  (*See* Tr. 462-463).

21

Several pieces of evidence suggest that Plaintiff meets the C criteria.  For example, while the evidence is not entirely clear, given Mr. Hale's testimony that Plaintiff sometimes resides with him, Plaintiff appears to have resided at Tender Mercies in a highly supportive living arrangement, for more than a year.  Plaintiff's case manager testified that she has contact with him  as often as three times per week.  *See, e.g., Pickett v. Comm'r of Social Security*, Civil Case No. 1:10-cv-528-MRB, 2011 WL 4368308 *17 (S.D. Ohio Aug. 11, 2011), R&R adopted September 19, 2011 (Listing 12.04(C) does not require institutionalized living; remanding in part to determine whether Plaintiff who was unable to function outside of home environment, where assistance was provided by family member and case manager, met or equaled Listing).  In addition, Dr. Rukseniene's opinion supports a finding that Plaintiff would be unable to tolerate even a minimal increase in mental demands that would result from adaptation to a work environment.  Other witnesses, including but not limited to Plaintiff himself, testified in a manner consistent with that opinion.

### E.  Remand Required for Further Fact-Finding

A sentence four remand under 42 U.S.C. §405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary.  *See Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted).

Despite the errors made by the ALJ, I conclude that remand, rather than an outright award of benefits, is the appropriate course of action in this case.  The evidence of record as to Plaintiff's claimed mental disability is limited, particularly for the period of time dating closer to 2005, and at times is equivocal, warranting further evaluation.  Although most of

Plaintiff's GAF scores have been below 50, a handful of scores in July 2006, April 2008, and February 2010, have ranged from 53-55, which is a level not inconsistent with unskilled work. (Tr. 321, 483, 613). In addition, the record reflects that Plaintiff has a support network that includes his AA friends and a partner with whom he has lived at times, and Plaintiff has been able to regularly use public transportation and go to the grocery store (at limited times) with his partner.[8] Therefore, the evidence of the degree of Plaintiff's mental impairment is not so one-sided that an immediate award of benefits should be made by this Court. In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher,* 17 F.3d at 175.

### III. Conclusion and Recommendation

The ALJ committed reversible error, and his finding of non-disability is not well-supported by substantial evidence in the record. Therefore, **IT IS RECOMMENDED THAT:**

1. The decision of the Commissioner to deny Plaintiff DIB and SSI benefits be **REVERSED** and this matter be **REMANDED** under sentence four of 42 U.S.C. §405(g);

2. On remand, the ALJ be instructed to: (1) re-assess all medical opinions, including the opinion of Plaintiff's treating physician, and provide additional reasons for the evaluation of such opinions consistent with this report; (2) carefully review evidence of Plaintiff's allegations of additional limitations; (3) include all relevant limitations into any hypothetical

---

[8] Plaintiff's reply memorandum points out several instances, including the reference to grocery shopping, in which Defendant has used partial quotations from the record and/or mischaracterized the record. While the Court appreciates zealous advocacy, the use of misleading partial quotations by Defendant at times exceeds that boundary.

presented to a vocational expert, and (4) fully evaluate whether Plaintiff meets or equals

Listing 12.03, 12.04, or 12.06;

3. As no further matters remain pending for the Court's review, this case be

**CLOSED.**

                                          */s Stephanie K. Bowman*
                                          Stephanie K. Bowman
                                          United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MICHAEL DEWAYNE COMPTON,                    Case No. 1:11-cv-626

        Plaintiff,                    Spiegel, J.
                                         Bowman, M.J.

     v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).